**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| FELICIA KELSO, |
| *Plaintiff*, |
| v. |
| DENNIS MCDONOUGH, Secretary, U.S. Department of Veterans Affairs, |
| *Defendant*. |

Civil Action No. 1:19-cv-0722 (CJN)

## MEMORANDUM OPINION

Felicia Kelso, a former Department of Veterans Affairs employee, alleges that her supervisors discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. *See generally* Compl., ECF No. 1. The Secretary moves for summary judgment. *See* Mot. for Summ. J., ECF No. 15. For the reasons stated below, the Court grants the Secretary's motion.

## I.      BACKGROUND

Kelso, an African-American woman of Caribbean descent, applied in 2010 to be an Administrative Specialist in the Department of Veterans Affairs Office of Facilities Programs and Plans. *See* Compl. ¶ 7. Kelso alleges that the then-Director of the Programs Project Management Services, Milan Srskic, originally offered her the position at a GS-9/11 level, which is a GS-9 position with the potential to be promoted to GS-11. *See id.* According to Kelso, two weeks after receiving this initial offer, Carol Gill, a human resources specialist, advised Kelso that she could not be hired as a GS-9 and proposed that she instead accept "the GS-9 position at a GS-7 level" with a commitment to attempt to elevate her position to a GS-9 after she started. *See*

Compl. ¶¶ 10–11; Pl.'s Depo. at 27–28.  Kelso accepted the GS-7 job later that month believing

that the position would be "corrected" to GS-9 shortly thereafter.  Compl. ¶ 13.

Within six months, Kelso began to experience problems with her coworkers.  In

September 2010, William Levay, a project manager, allegedly confronted Kelso, accusing her of

giving preferential treatment to one of the three regional offices she was charged with servicing.

Pl.'s Depo. at 35.  When Kelso denied the claim, Levay allegedly became visibly angry and

doubled down on his accusations.  Compl. ¶ 24.  Kelso says that she reminded Levay that he was

not her supervisor.  Levay mockingly called Kelso "Sergeant," seemingly referencing her prior

military service.  *See* Compl. ¶ 26.  Kelso took offense.  She told Levay that they were not in the

military anymore and that she wanted to be addressed by her name.  Pl.'s Depo. at 36.

The following day, Levay approached Kelso and told her that she would be "blackballed"

if she did not heed his warnings against favoritism.  *See* Compl. ¶ 27.  Although Kelso

acknowledges that she did not believe Levay used the term "blackballed" as a racial epithet, she

did perceive that his negative attitude toward her was based on her race and gender.  Pl.'s Depo.

at 40.

Kelso quickly reported Levay's behavior to Gill.  *See* Pl's Resp. to Def's Interrogs.

("Kelso Interrogs."), ECF 15-4, at 1–2.  Specifically, Kelso told Gill that Levay had unfairly

threatened her and spoke down to her in a hostile and disrespectful way.  *See id.*  She did not,

however, claim that Levay's actions were a product of racial or sex discrimination.  *Id.*  In fact,

she did not recall during her deposition using the word discrimination at all during this

conversation with Gill.  Kelso Depo. at 42.

Less than a month after her confrontational interactions with Levay, Kelso asked Srskic,

the then-Director for Programs Project Management Services, to convene an office-wide meeting

to finally resolve the tension with Levay.  Pl.'s Depo. at 36, 41–43.  Rather than bringing down the temperature on their apparent feud, the meeting only ratcheted up the heat.  Levay—who was apparently caught off guard that the focus of an office-wide meeting was his treatment of Kelso—became angry and told Kelso that if she would not do what Levay wanted, the Department did not "need [her] here."  Kelso Interrogs. at 2.

Kelso alleges that, three weeks after this meeting, an open GS-9/11 position listed on the Department's human resources website was changed to a GS-9 position—meaning there was no potential for promotion to GS-11.  Comp. ¶ 30.  In December 2010, Kelso was promoted to that GS-9 Administrative Specialist position, a position she held for the remainder of her employment with the Department.  During that time, Kelso believed that, although her job title reflected a GS-9 position, she was performing the duties of a GS-11.

In December 2011, the Department hired Carla Carter, an African-American woman, as a GS-11 Staff Assistant.  Compl. ¶ 36.  Until then, Kelso had been the only female, black, and Caribbean-American employee in the Construction and Facilities Management Office.  *See id.*

Shortly after Carter joined the office, Kelso emailed Marge Pearce, the Department's Chief of Classification, requesting a desk audit concerning her employment level.  *See* December 27, 2021 Email to Marge H. Pearce, ECF No. 18-3, 169.  Pearce informed Kelso that a desk audit could only be initiated by an employee's supervisor and that the supervisor must explain to human resources what has changed since the employee's position was classified.  *Id.*  After no action was taken on Kelso's request, she emailed Dennis Milsten, who had recently replaced Srskic as Kelso's direct supervisor, with the same request.  Milsten advised Kelso that she would not be promoted to GS-11 because she had not reached full performance at GS-9.  The next day, Kelso contacted the Department's Office of Resolution Management, which handles the VA's

Equal Employment Opportunity ("EEO") claims.  Kelso completed her interview the following day, in which she claimed that she suffered discrimination because (1) management failed to reclassify her position to GS-9/11; (2) she had received a performance rating on a position description that did not reflect her grade and series; and (3) duties were taken from her in an attempt to downgrade her position.  *See generally* Shakir Decl., ECF No. 15-2.

The following day, Milsten shifted Kelso's duties regarding certain executive correspondence to Carter and Kelso's supply ordering tasks to Janelle Massey, a black woman who was a GS-7 student trainee.  Pl.'s Depo. at 58–60.  Kelso claimed that she did not know Milsten had reassigned these duties, but stated that "out of fairness," Milsten should have forewarned her that the duties would be transferred to her coworkers.  Pl.'s Depo. at 60–61.

From February 2012 to April 2012, Kelso was involved in a number of interpersonal disputes with her coworkers, which she claims are evidence of discrimination and retaliation.  Kelso alleges that on February 24, 2012, while she was briefly away from her desk, a Hispanic student trainee approached Kelso's desk area and turned down her music.  When Kelso reported the incident to Milsten, he immediately sent out an office-wide email reminding staff to respect each other's space.  Shakir Decl. 32–33.  Three days later, Milsten raised his voice to Kelso in a condescending tone while discussing her position description and performance plan.  Shakir Decl. at 34.

On March 14, 2012, after Kelso mistakenly sent an email to the regional field offices instead of circulating it internally, Levay approached her desk and spoke to her in a manner that made Kelso feel incompetent.  Pl.'s Depo. at 64–66.  And, on the same day, a black male coworker told Kelso that he had a dream that she killed people in the office.  Pl.'s Depo. at 67.

On April 19, 2012, Carter emailed two co-workers commenting that Kelso "did not lift a finger" in connection with a certain task and that Carter "should have had her ironing."  Carter Email, Ex. 7, ECF 15-4.  And a week later, Carter allegedly made nasty comments about Kelso to two co-workers.  Pl.'s Depo. at 71–72.  Kelso reported each of these incidents to Milsten.

Seven months later, Kelso finally reached her breaking point when Carter threw a manila file folder at her, hitting her in the chest.  After informing Milsten of the incident, Kelso went to the hospital in an ambulance.  Shortly thereafter, Kelso began searching for a new job and, five months later, found one with the United States Forest Service.  Pl.'s Depo. 78.

In 2018—remarkably, more than six years after Kelso had initially complained to the Department's Office of Resolution Management—the U.S. Equal Employment Opportunity Commission affirmed the Department's 2015 final decision on Kelso's claims, concluding that the Department had not engaged in unlawful discrimination or retaliation.  Compl. ¶ 5.  In 2019, Kelso commenced this civil action by filing a Complaint alleging four claims under Title VII of the Civil Rights Act of 1964.  Kelso alleges that Defendant subjected her to unlawful discrimination based on her sex, race, and national origin, *see* Compl. ¶¶ 67–69; unlawful retaliation, *see* Compl. ¶¶ 73–76, and separate claims based on a discriminatory and retaliatory hostile work environment, *see* Compl. ¶¶ 70–71.

## II.    LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A factual dispute is material if it could alter the outcome of the litigation.  *See Anderson*, 477 U.S. at 248.  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The moving party always "bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When this showing has

been made, the non-moving party bears the burden of setting forth "specific facts showing that

there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

Thus, to avoid summary judgment, the non-movant must present some objective evidence

that would enable the court to find entitlement to relief.  "[T]he mere existence of a scintilla of

evidence in support of the [non-movant's] position will be insufficient; there must be evidence

on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

"[M]erely colorable or not significantly probative evidence . . . is insufficient." *Potter v. District

of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009).

### III.      ANALYSIS

### A.      Discrete Discrimination Claims

Title VII makes it unlawful for an employer "to discriminate against any individual with

respect to compensation, terms, conditions, or privileges of employment" on the basis of that

individual's race color, religion, sex, or national origin.  42 U.S.C. § 2000e–2(a).  Title VII

discrimination claims that lack direct evidence of discrimination are subject to the burden-

shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  To

make such a showing, a plaintiff must point to evidence demonstrating that:  "(1) she is a

member of a protected class; (2) she suffered an adverse employment action; and (3) the

unfavorable action gives rise to an inference of discrimination."  *Stella v. Mineta*, 284 F.3d 135,

145 (D.C. Cir. 2002).  Once an employee has made this showing, the burden shifts to the

employer, who bears the burden of identifying "the legitimate, non-discriminatory . . . reason" for taking the complained of action. *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). If the employer provides such a justification, the employee must show that the employer's justification is pretextual. *Id.*

Typically, at summary judgment district courts do not assess the first prong of the *McDonnell Douglas* framework. The Court of Appeals has cautioned that such an inquiry is "usually misplaced." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, (D.C. Cir. 2008). That is because at summary judgment "employers ordinarily attempt to satisfy the second prong" of the *McDonnell Douglas* framework by providing a legitimate explanation for the contested action, and "they often succeed" at making such a showing. *Figueroa v. Pompeo*, 923 F.3d 1078, 1086–87 (D.C. Cir. 2019). When an employer satisfies the second prong, a district court's "analysis of the prima facie factors at summary judgment become gratuitous, even confusing," and fails to "simplify judicial proceedings." *Id.*

To avoid this "largely unnecessary sideshow," *Brady*, 520 F.3d at 494, the Court of Appeals in *Brady v. Office of the Sergeant at Arms* "offered a shortcut" to district courts, *Figueroa*, 923 F.3d at 1087. "Where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494. Instead, the court should skip to step three of *McDonnell Douglas* and determine whether the employee can point to any evidence that the employer's justification for the action was pretextual. *Id.*

But this "*Brady* shortcut" has a critical caveat: It "applies only if the parties properly move past the second [*McDonnell Douglas*] step." *Figueroa*, 923 F.3d at 1087. When, as here,

the employer challenges whether an adverse employment action was taken, or when an employer

has not proffered a legitimate, non-discriminatory justification for the adverse employment

action taken, a district court cannot employ the *Brady* shortcut.[1]  *See Webster v. U.S. Dep't of*

*Energy*, 267 F. Supp. 3d 246, 258 (D.D.C. 2017) (noting that a summary judgment the prima

facie case inquiry is "not always irrelevant").  In such instances, the court must instead engage in

the sometimes-difficult task of determining whether the employee has made out a prima facie

case of discrimination.

Kelso asserts two discrete discrimination claims.  But neither survives step one of the

*McDonnell Douglas* burden-shifting framework either because (1) Kelso has not demonstrated

that she suffered a materially adverse employment action or because (2) Kelso has not

demonstratred that the claimed actions were taken because of Kelso's membership in a protected

class.

Kelso's first discrimination claim involves the September 2010 incidents with Levay.  To

briefly recap, during their interactions, Levay accused Kelso of failing to treat the three outside

offices that she was responsible for servicing equally; allegedly spoke to Kelso in a demeaning

way; mockingly called her "Sergeant"; and threatened her, saying that she would be

"blackballed" if she failed to treat the outside offices equally.

These allegations, although demonstrative of a tense and unpleasant office spat between

coworkers, do not qualify as a materially adverse employment action under Title VII.  After all,

"not everything that makes an employee unhappy is an actionable adverse employment action."

---

[1] In this case, the Parties dispute whether Kelso has suffered an adverse employment action, *see* Def.'s Mot. at 31 (arguing that the claimed adverse employment actions are "insufficient to establish that Plaintiff suffered a cognizable materially adverse employment action"), and Defendant has not attempted to proffer legitimate explanation for any potential adverse employment action.  Additionally, the Parties filings focus exclusively on step one of the *McDonnell Douglas* framework, so that is where the Court will direct its attention.

*Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). Rather, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). Paradigmatic examples of adverse employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).

Kelso does not allege, much less provide evidence demonstrating, that her confrontations with Levay altered the "terms, conditions, or privileges" of Kelso's employment. *Forkkio*, 306 F.3d at 1131. She does not claim that Levay fired, demoted, suspended, disciplined, or otherwise subject her to an action that impacted her employment status. Kelso has therefore failed to make a showing that Levay's actions constitute an adverse employment action.

Further, there is no evidence that Levay acted with hostility to Kelso because of her sex, race, or national origin. Kelso does not point the Court to anything in the record supporting, either directly or indirectly, Plaintiff's allegation that Levay spoke to her in an aggressive and caustic manner because she is a member of a protected class. This discrimination claim therefore cannot survive summary judgment.

Kelso's second discrimination claim, which fairs slightly better but ultimately resolves in the same manner, centers on her claim that Milsten failed to promote to her. Failing to promote is a prototypical example of an adverse employment action. *See Douglas*, 559 F.3d at 552. But Kelso has again failed to point the Court to any evidence in the record demonstrating that Milsten did not promote Kelso on account of her race, sex, or national origin. In fact, the limited

evidence in the record seems to indicate that Milsten gave ample opportunities to Kelso's colleagues in her protected class.  For instance, when Milsten took job responsibilities and duties away from Kelso, he gave them to other African-American women.  This cuts against Kelso's attempt to establish prima facie discrimination claim.  *See Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298 (2005) (finding that Plaintiff established a discriminatory nexus when, despite meeting the minimum qualifications, she was passed over for multiple job openings that all went to individuals outside of her protected class).  Because there is no additional evidence in the record to demonstrate that Milsten failed to promote Kelso because of her race, national origin, or sex, it ultimately proves fatal to this discrimination claim.

Because Kelso has failed to proffer evidence that she suffered an adverse employment action or that any adverse employment action she might have suffered was the result of sex, race, or national origin discrimination, the Court grants summary judgment on this claim to the Secretary.

### B.      Discriminatory Hostile Work Environment Claim

Title VII makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)).

For a plaintiff's claim to survive summary judgment, the Court must be satisfied that a reasonable juror looking at the evidence could conclude that a plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  In making this determination, courts look to "the

totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014). Courts apply an "objective standard by considering whether a reasonable person in a plaintiff's position would find the conduct "severely hostile or abusive." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). And to be actionable under Title VII, the conduct must be "extreme" and go beyond "the ordinary tribulations of the workplace, such as sporadic use of abusive language . . . and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998).

The alleged incidents that form the base of a hostile work environment claim must also "give rise to an inference of discrimination." *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003). This means that when examining a hostile work environment claim courts must "exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

The Secretary argues that he is entitled to summary judgment because (1) Plaintiff's allegations of harassment are not sufficiently severe or pervasive to alter the conditions of her employment, and (2) the alleged incidents forming the basis of the hostile work environment claim do not give rise to an inference of discrimination. The Court agrees on both fronts.

Kelso bases her discriminatory hostile work environment claim on several interactions, occurring in two general time periods that are more than 16 months apart. Kelso first points to her interactions with Levey in September 2010, discussed above. Kelso does not identify any other instances of hostile or unwanted behavior towards her for more than a year. Then, from February 2012 to April 2012: (1) a student trainee turned down Kelso's radio while Kelso was using the restroom; (2) Milsten raised his voice and spoke condescendingly when addressing a

performance issue and her GS-11 promotion; (3) Levay chastised Kelso for sending an email to the incorrect recipients; (4) a coworker told Kelso that he dreamed that she killed people in the office; and (5) Carter spoke negatively about Kelso behind her back.  And in November 2012, Carter threw a manila folder at Kelso, hitting her in the chest.

As in many cases, these interactions may be boorish and reflect poorly on the participants, but they are not sufficiently severe or pervasive to form an actionable Title VII claim.  Instead, the vast majority of Kelso's claims involve minor personal squabbles with coworkers.  They include disputes over emails, noise coming from Kelso's cubicle, office gossip, and Kelso's boss being condescending during a performance review.  These actions represent the "ordinary tribulations of the workplace," which are insufficient to make a prima facie hostile work environment claim.  *Faragher*, 524 U.S. at 788.  After all, to be actionable the conduct complained of "must be extreme to amount to a change in the terms and conditions of employment."  *Id.* at 788.  This standard is designed to be "sufficiently demanding" so that anti-discrimination statutes do not become "general civility code[s]."  *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Even if Kelso could establish that she was subjected to abusive conduct that was objectively severe or pervasive, she has failed to proffer evidence that the conduct was motivated by her membership in a protected class.  Kelso alleges that she was subjected to a hostile work environment either because she is African-American, of Caribbean-descent, or a female.  Yet she points to no evidence demonstrating that this is the case.  It is well-established that "hostile behavior, no matter how unjustified or egregious, cannot support a claim of a hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's

membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009). Kelso has simply failed to show this linkage.

Because Kelso has failed to demonstrate that the actions taken against her were so severe or pervasive as to alter the conditions of her employment and has also failed to point to evidence in the record giving rise to an inference of discrimination, the Court will grant Defendant's motion for summary judgment on his claim.

## C.     Retaliatory Hostile Work Environment Claim

For a retaliatory hostile work environment claim to survive summary judgment, a plaintiff must show that a reasonable juror, taking the evidence in the light most favorable to the plaintiff, could conclude that (1) she engaged in a "protected EEO activity"; and (2) "a causal connection between the harassment [she] suffered and [her] involvement in the protected EEO activity." *Na'im*, 626 F. Supp. 2d at 79.

The Parties agree that Kelso satisfies the first element of a retaliatory claim—she engaged in a protected EEO activity.  Yet they disagree about *when* Kelso first engaged in that activity.  Kelso argues that her September 2010 conversation with Gill, in which she addressed an interpersonal problem with Levay, constituted a protected activity.  *See* Pl.'s Opp'n at 27. Defendant argues that because Kelso did not raise a claim of discrimination with Gill during their September 2010 conversation, Kelso's first protected EEO activity was not until February 2012, when Plaintiff first contacted the VA's Office of Resolution Management.  *See* Def's Mot. at 25.

Under Title VII, a "protected activity" is an "employee's opposition to an unlawful employment practice or . . . an employee's participation in a discrimination charge, investigation, or proceeding."  *Burton v. Batista*, 399 F. Supp. 2d 97, 114 (D.C. 2004).  "While no magic words

are required" to mark an exchange a protected activity, the employee "must in some way allege unlawful discrimination." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

Kelso acknowledges that in her 2010 conversation with Gill, she did not even mention, much less allege, that Levay's actions toward her were based on unlawful discrimination. *See* Compl. ¶¶ 24–30.  To be sure, Kelso insisted that Levay mistreated her by threatening her and talking to her in a demeaning way.  Kelso Interrogs., 1–2.  But she made no claims that a reason for his rude behavior was based on Kelso's race, sex, national origin, or any other identity characteristic protected by Title VII.  *Id.*  It wasn't until 2012, when Kelso contacted the VA's Office of Resolution Management to discuss the fact that she had not yet been promoted, that Kelso first raised a discrimination claim.  That was the moment that she first engaged in a protected EEO activity.  Any allegedly hostile events occurring prior to Kelso's February 2012 contact with the Office of Resolution Management cannot be considered as part of Kelso's retaliatory hostile work environment claim.  *Broderick*, 437 F.3d at 1232.

When looking at the events that occurred *after* Kelso's 2012 complaint to the Office of Resolution Management, the result is no different than her discriminatory hostile work environment claim:  She has not proffered evidence that her treatment was severe or pervasive. *Harris*, 510 U.S. at 21.  In fact, Kelso's retaliatory hostile work environment claims are slightly weaker than her discriminatory hostile work environment claims because they do not include Levay's actions from September of 2010.

And just as Kelso has failed to proffer evidence of a requisite discriminatory nexus relating to her hostile work environment claim, she has failed to point to record evidence suggesting that a causal connection exists between protected EEO activity and the alleged harassment.  Indeed, Kelso does not allege, let alone cite to any record evidence, that two of her

14

co-workers—the student trainee who turned down Kelso's music or the coworker who told her about his dream—even knew that she had complained to the Department's Office of Resolution Management.

Kelso cannot demonstrate that the actions taken against her were so severe or pervasive as to alter the conditions of her employment and the alleged incidents forming the base of the hostile work environment claim cannot give rise to an inference of retaliation.  Therefore, the Court will grant Defendant's motion for summary judgment on this claim.

### D.    Retaliation Claim

To prevail on a claim of discrete acts of retaliation under Title VII, a plaintiff must show that "that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Walker v. Johnson*, 798 F.3d 1085, 1091–92 (D.C. Cir. 2015).  A materially adverse action for the purposes of retaliation "is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination." *Newton v. Office of the Architect of the Capitol*, 839 F. Supp. 2d 112, 116 (D.D.C. 2012).  Although the "universe of cognizable retaliatory actions is broader than that of discriminatory actions, as a reasonable worker could be discouraged from reporting abuse by actions that might not themselves be considered abuse," *Swann v. Officer of the Architect of Capitol*, 73 F. Supp. 3d 20, 26–27 (D.D.C. 2014), it is not so broad as to allow the federal judiciary to sanction trivial harms or micromanage a supervisor's decisions. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70–71 (2006).  When, as here, there is no direct evidence of retaliation, the familiar McDonnell Douglas burden-shifting framework applies. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Since Kelso's protected activity occurred in February 2012, any alleged retaliatory actions had to occur after that date to be actionable.  The post-February 2012 actions of Kelso's

coworkers—including the student trainee turning down her music, a colleague informing others of a macabre dream involving Kelso, and Levay chastising Kelso for sending an email to the wrong group of recipients—were perhaps rude or inappropriate, but none of these alleged actions "could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination." *Newton*, 839 F. Supp. 2d at 116. And, perhaps more significantly, Kelso cannot point to any evidence indicating that her coworkers took these actions because she previously engaged in a protected activity.

Kelso also points to the reassignment of certain work responsibilities in February 2012 as a potential adverse employment action. In particular, two days after Milsten informed Kelso that she would not be promoted and one day after Kelso filed her EEO complaint, Milsten reassigned Kelso's responsibility for certain executive correspondence to Carter, an African-American woman who recently transferred into the office as a GS-11 and (Defendant argues) was in need of additional work. Milstein also transferred the handling of requests for office supplies from Kelso to Massey, an African-American women employed at a GS-7 level because, Defendant contends, Milsten believed those clerical duties were appropriate for a lower-grade employee. Kelso insists that these two changes were materially adverse and therefore actionable.

The Court disagrees. Although a significant change in an employee's work assignments is "a classic and widely recognized example of forbidden retaliation," *Burlington*, 548 U.S. at 71, courts in this district have noted that to be considered a significant change the duties assigned away from the employee must be either a "substantial[]" part for her work, *Lee v. Winter*, 439 F. Supp. 2d 82, 85 (D.D.C. 2006), or particularly "prestigious," *Robb v. Vilsack*, 2021 WL 3036796, *12 (D.D.C. July 19, 2021). That is because Title VII's "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or

harm." *Burlington*, 548 U.S. at 67.  Here, even under "the more lenient standard" for retaliation, Kelso has failed to demonstrate the reassignment of some of her minor duties constituted an adverse employment action.  *Brookens v. Solis*, 616 F. Supp. 2d 81, 91 (D.D.C. 2009) (finding denial of desk audit did not qualify as adverse action under retaliation standard where plaintiff did not allege any resulting injury or harm).

Because Kelso has failed to demonstrate that she suffered an adverse employment action, the Court grants summary judgment on Kelso's discrete retaliation claim to Defendant.

## IV.   CONCLUSION

For the reasons stated above, the Court grants Defendant's Motion for Summary Judgment.  A separate order will issue.

DATE:  August 30, 2021

CARL J. NICHOLS
United States District Judge